1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT

7                          FOR THE DISTRICT OF ARIZONA

8

9    James Matthewson,                    )    No. CV-10-2235-PHX-NVW (LOA)
                                          )
10                Petitioner,             )    **REPORT AND RECOMMENDATION**
                                          )
11   vs.                                  )
                                          )
12   Charles L. Ryan, et al.,             )
                                          )
13                Respondents.            )
                                          )
14   _____)

15            This matter is before the Court on Petitioner's Petition for Writ of Habeas Corpus

16   by Person in State Custody pursuant to 28 U.S.C. §2254. (Doc. 1)  Respondents filed an

17   Answer, doc. 14, to which Petitioner has replied, doc. 15.  An evidentiary hearing is not

18   warranted in this case. *See Cullen v. Pinholster*, ___ U.S. ___ , 131 S.Ct. 1388 (2011) (holding

19   that, when a petitioner seeks habeas relief under 28 U.S.C. § 2254(d)(1), federal courts are

20   restricted to the state court record when deciding claims previously adjudicated on the merits

21   by the state courts.).  For the reasons set forth below, the Petition should be denied.

22   **I. Factual and Procedural Background**

23                     **A.  Facts, Trial and Sentencing**

24            The following incident gave rise to Petitioner's challenged conviction.[1]  On the

25   morning of April 6, 2007, Petitioner and several friends drove from Tucson to Saguaro Lake

26

27   _____

28            [1]  The Honorable Boyd T. Johnson presided over Petitioner's trial in the Superior Court
     of Arizona, Pinal County.

to go boating. (Doc. 14 at 2; Respondents' Exh. M at 34[2]) Petitioner towed his boat behind his car. (Doc. 14 at 2) On the way to lake, Petitioner's friends bought wine coolers and beer. (Respondents' Exh. O at 35) He testified that he drank about five cans of beer and two alcoholic Jello shots while on the lake and after returning to the boat launch. (Respondents' Exh. O at 36-40) "[P]retty quick[ly] after" drinking the Jello shots, Petitioner began driving back to Tucson. (*Id*. at 40) He testified that he never felt "buzzed or drunk." (*Id*. at 41)

On the drive back to Tucson, Petitioner and his passengers stopped once to eat and another time to use the restroom. (*Id*. at 41-42) After the second stop, Petitioner did not stop again before the accident that killed John Gaylord. (Respondents' O at 42-43)

That same day, at about 3:45 in the afternoon, Richard Husk and John Gaylord began traveling south from Chandler on their motorcycles to go out to eat. (Respondents' Exh. M at 11-12) Husk had one beer at approximately noon, and testified that he did not consume any other alcohol that day. (*Id*. at 13-14) Husk also testified that, to the best of his knowledge, Gaylord did not consume any alcohol that day. (*Id*.) After eating dinner, Husk and Gaylord headed back to Chandler on their motorcycles. (*Id*. at 13) They left the restaurant at dusk. (*Id*.)

At trial, Husk testified that he and Gaylord stayed in the same formation while riding their motorcycles. (Respondents' Exh. M at 13-15)

> Q. Did you guys have a plan for your ride in terms of how you were going to ride?
>
> A. Yes. We had set that time out in prior rides and re-established it prior to this ride. . . . He was going to ride behind me, and we were going to slow down if cars came up behind us in order to allow them to pass more safely and pass both motorcycles at one time as we were riding staggered approximately two car lengths apart.
>
> Q. Which side of the road were you riding on?
>
> A. I was riding on the right side of the road where the passenger side of a car tire would be.
>
> Q. And which side was [Gaylord] on?

---

[2] Citations to "Respondents' Exh. __" are to exhibits attached to Respondents' Answer, doc. 14. The Court cites the page numbers as they appear in each individual exhibit.

| | |
|---|---|
| A. | He was on the left side of the northbound lane where the driver side tire would be. |
| Q. | And was that the pattern you rode the entire way? |
| A. | Both directions, yes. |

(*Id*. at 13-14)

Petitioner gave a different version of the incident:

| | |
|---|---|
| Q. | Well, I'm just going to ask you to describe in as much detail as you can just from the first time that you noticed something in the roadway or somebody coming towards you and just walk us through what happened and what you saw. |
| A. | I remember driving down the right side of the road . . . . I saw two headlights coming my direction, I thought it was a car that I had seen pass by. Then two headlights split and one came in my lane. . . . I just yanked the wheel . . . . The next thing I know, we were upside down and I was yelling at everybody in the car if they were okay. |

(Respondents' Exh. O at 43)

A witness, an off-duty police officer William Tatlock, also gave an account of the events that differed from Husk's testimony. (Respondents' Exh. N at 167) Tatlock testified that he followed the motorcycles for a mile or two before passing them. (Respondents' Exh. N at 176) He testified that when he passed them, the orange (Gaylord's) motorcycle was in the lead and the black (Husk's) motorcycle was behind. (*Id*. at 170) After passing the motorcycles, Tatlock pulled into a rest area. (*Id*. at 171) He heard, but did not see, the accident. (*Id*.) Petitioner's boat struck and killed John Gaylord. (Doc. 1 at 3; Respondents' Exhs. M at 160) At approximately 8:22 that evening, Officer Vernon Havens of the Arizona Department of Public Safety responded to a call regarding a car versus motorcycle collision. (Respondents' Exh. M at 157) Officer Havens arrived at the scene at approximately 8:45. (*Id*. at 158) Petitioner told Officer Havens he was driving the car that was involved in the accident. (*Id*. at 161-62) Officer Havens secured the scene and returned to speak with Petitioner, but this time Officer Havens "detected a very faint odor of intoxicating liquor emitting from [Petitioner's] breath." (*Id*. at 167) Officer Havens asked Petitioner if he had consumed any alcohol that day, and Petitioner replied that he had but that he did not feel any effects of the alcohol. (*Id*. at 167-

168)  After Petitioner consented, Officer Havens administered a horizontal gaze nystagmus (HGN) test[3] and observed two clues of HGN.[4]  (Respondents' Exh. M at 169-76)  After administering the HGN test, Officer Havens conducted a non-evidentiary breath test that showed the presence of alcohol. (*Id*. at 180)  With Petitioner's consent, Officer Havens also took blood samples at 9:43 p.m., 11:25 p.m., and 12:20 a.m. (*Id*. at 180-184, 190)  The blood was analyzed and returned a blood alcohol concentration of .088 for the 9:43 p.m. sample, Respondents' Exh. S at 6, .037 for the 11:25 p.m. sample, *id*. at 10, and .022 for the 12:20 a.m. sample, *id*. at 10-11.

Based on the foregoing, Petitioner was indicted on one count of dangerous manslaughter, a class 2 felony; one count of criminal damage, a class four felony; three counts of endangerment, class 6 felonies; and two counts of misdemeanor driving under the influence ("DUI"). (Respondents' Exh. A)  Petitioner's case proceeded to trial, and a jury convicted him of the lesser included crime of negligent homicide, dangerous nature (Count 1); and two counts of DUI, finding that Petitioner was impaired and driving with a blood alcohol concentration above .08 (Counts 6 and 7).  (Respondents' Exh. B at 2; Exh. C)  The trial court sentenced Petitioner to a mitigated term of five years' imprisonment for the negligent homicide, suspended the imposition of sentence on the remaining offenses, and imposed a three-year term of supervised probation to begin after his release from prison.  (Respondents' Exh. B at 2)

**B. Direct Appeal**

Petitioner appealed to the Arizona Court of Appeals, contending that the trial court improperly admitted evidence of the blood test results. (Respondents' Exh. A, doc. 14-1)  On April 30, 2009, the Arizona Court of Appeals rejected that argument and affirmed Petitioner's

---

[3] Horizontal gaze nystagmus is the involuntary jerking of eyes, which can be a sign of ingestion of alcohol or drugs.  (Respondents' Exh. M at 169)

[4] Officer Havens testified that four cues or more mean there is approximately an 80 percent chance that the person is over the .08 legal limit for alcohol.  (Respondents' Exh. M at 177) Officer Havens has a 93 percent accuracy rating regarding HGN tests, meaning his conclusion from an HGN test of whether a subject is over the legal alcohol limit is correct 93 percent of the time.  (*Id.* at 178-79)

convictions. (Respondents' Exh. B) Petitioner did not seek review in the Arizona Supreme Court. (*Id.*)

### C. Post-Conviction Proceedings

On May 27, 2009, Petitioner filed a notice of post-conviction relief pursuant to Ariz.R.Crim.P. 32. (Respondents' Exh. C, doc. 14-1) On July 22, 2009, Petitioner, through counsel, filed his petition for post-conviction relief. (Respondents' Exh. D, doc. 14-1) Petitioner alleged ineffective assistance of counsel, arguing that trial counsel "[g]enerally failed to subject the State's case to meaningful adversarial testing." (*Id.*at 2) Specifically, Petitioner argued that counsel (1) "failed to challenge the core of the State's case, *i.e.*[,] a blood alcohol reading barely above the legal presumption when in fact all the other evidence strongly suggested the [Petitioner] was below the presumption of intoxication or even presumed not to be intoxicated;" (2) "[d]id not present his own expert whose testimony could have made a significant case to the jury that there was reasonable doubt as to whether the [Petitioner] was intoxicated;" (3) "[f]ailed to submit a theory of defense instruction concerning supervening and intervening cause which instruction was justified by the evidence;" and (4) "[f]ailed to object to the State's video reenactment of the accident and failed to object to the State's animations which were unfair and inaccurate representations of the event in question." (*Id*. at 2-3) The trial court denied relief on November 5, 2009, finding that while Petitioner "did not receive a 'perfect' trial, he did receive a fair trial." (Respondents' Exh. F) The court further found that "no single issue . . . nor all the issues in conjunction, could lead [the] Court to find that Defendant's trial counsel was so ineffective as to mandate setting aside the jury's verdict, the convictions, and ordering a new trial." (*Id*.)

Petitioner filed a petition for review in the Arizona Court of Appeals, which denied relief on April 8, 2010. (Respondents' Exhs. G, H) On May 3, 2010, Petitioner filed a petition for review in the Arizona Supreme Court, which was denied on September 7, 2010. (Respondents' Exhs. I, J).

/ / /

/ / /

**D. Petition for Writ of Habeas Corpus**

On October 19, 2010, Petitioner, through counsel, filed a timely[5] Petition for Writ of Habeas Corpus, raising the following four claims of ineffective assistance of counsel: (1) failure to present expert testimony to challenge the blood-test evidence; (2) failure to request a theory of defense instruction regarding causation; (3) failure to ask questions concerning the correlation between the HGN test and a blood alcohol reading in a pretrial interview; and (4) failure to ask an eyewitness about the positioning of the motorcycles in a pretrial interview. (Doc. 1) Respondents concede that Petitioner presented his claims to the State courts and that they are properly before this Court on habeas corpus review. (Doc. 14)

**II. Standard of Review**

This Court's review of Petitioner's claims is constrained by the applicable standard of review set forth in 28 U.S.C. § 2254(d), as amended in 1996 by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). The ADEPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under the law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). The standard in § 2254(d) is "meant to be" "difficult to meet." *Harrington v. Richter*, ___ U.S., ___ , 131 S.Ct. 770, 786 (2011). Section "2254 stops short of imposing a complete bar on federal court relitigation of claims already rejected in state court proceedings." *Id*. (citations omitted). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunction in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979)).

If an habeas corpus petition includes a claim that has been "adjudicated on the merits in State court proceedings," federal habeas relief is not available unless it is shown that the state

_____

[5] Respondents concede that the Petition is timely in accordance with the applicable one-year statute of limitations. (Doc. 14 at 4); 28 U.S.C. § 2244(d)(1)). The record supports Respondents' conclusion that the Petition is timely.

court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); *Green v. Fisher*, __ U.S.__, 2011 WL 5335411, at * 3 (Nov. 8, 2011); *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2). *Richter*, 131 S.Ct. at 785; *see also Mancebo v. Adams*, 435 F.3d 977, 978 (9th Cir. 2006). This is a "difficult to meet," *Richter*, 562 U.S. ___, 131 S.Ct. at 786, and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (citation and internal quotation marks omitted). The petitioner bears the burden of proof. *Id*. at 25.

To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law, courts look exclusively to the holdings of the Supreme Court which existed at the time of the state court's decision. *Green*, 2011 WL at * 3; *Richter*, 131 S.Ct. at 786 (citing *Renico v. Lett*, 559 U.S. ___ , ___, 130 S.Ct. 1855, 1866 (2010)). Even if the state court neither explains its ruling nor cites United States Supreme Court authority, the reviewing federal court must nevertheless examine Supreme Court precedent to determine whether the state court reasonably applied federal law. *Richter*, 131 S.Ct. at 784 (citing *Early v. Packer*, 537 U.S. 3, 8 (2003)). The Supreme Court held in *Early*, and reaffirmed in *Richter*, that citation to federal law is not required and that compliance with the habeas statute "does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *Richter*, 131 S.Ct. at 784. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim', not a component of one, has been adjudicated." *Richter*, 131 S.Ct. at 784.

Under § 2254(d), a state court's decision is "contrary to" federal law if it applies a rule of law "that contradicts the governing law set forth in [Supreme Court] cases or if it

confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Mitchell v. Esparza*, 540 U.S 12, 14 (2003) (citations omitted); *Williams*, 529 U.S. at 411. A state court decision is an "unreasonable application of" federal law if the court identifies the correct legal rule, but unreasonably applies that rule to the facts of a particular case. *Id.* at 405; *Brown v. Payton*, 544 U.S. 133, 141 (2005). An incorrect application of federal law does not satisfy this standard. *Yarborough v. Alvarado*, 541 U.S. 652, 665-66 (2004) (stating that "[r]elief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable."). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree on the correctness of the state court's decision.'" *Richter*, 131 S.Ct. at 786 (citing *Yarborough*, 541 U.S. at 664). "'[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determination.'" *Id.* .

The Court will consider Petitioner's claims in view of the foregoing standard. However, the Court first notes that an evidentiary hearing is not appropriate in this case. The Supreme Court recently held "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, __ U.S. ___, 131 S.Ct. 1388, 1398 (2011) (explaining that § 2254(d)(1) "refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court.") Here, Petitioner's claims were adjudicated on the merits on post-conviction review. The state court "identifie[s] the correct governing legal principle," thus, this Court must assess whether that decision "unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 405, 413. "It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts

not before the state court." *Pinholster*, 131 S.Ct. at 1399. Thus, this Court's review is limited to the record that was before the state court.

## III. Analysis

Petitioner presents three claims of ineffective assistance of counsel. The controlling Supreme Court precedent on claims of ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must show that counsel's performance was objectively deficient and that counsel's deficient performance prejudiced the petitioner. *Id.* at 687; *Hart v. Gomez*, 174 F.3d 1067, 1069 (9th Cir. 1999). To be deficient, counsel's performance must fall "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. When reviewing counsel's performance, the court engages a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment. *Id.* "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Review of counsel's performance is "extremely limited." *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir. 1998), *rev'd on other grounds*, 525 U.S. 141 (1998). Acts or omissions that "might be considered sound trial strategy" do not constitute ineffective assistance of counsel. *Strickland*, 466 U.S. at 689.

To establish a Sixth Amendment violation, petitioner must also establish that he suffered prejudice as a result of counsel's deficient performance. *Id.* at 691-92. To show prejudice, petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *Hart*, 174 F.3d at 1069; *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998). The prejudice component "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). The court may proceed directly to the prejudice prong. *Jackson v. Calderon*, 211 F.3d 1148, 1155 n. 3 (9th Cir. 2000) (citing *Strickland*, 466 U.S. at 697). The court,

however, may not assume prejudice solely from counsel's allegedly deficient performance. *Jackson*, 211 F.3d at 1155.

"'Surmounting *Strickland's* high bar is never . . . easy.'" *Richter*, 131 S.Ct. 770, 786 (quoting *Padilla v. Kentucky*, __ U.S.___, 130 S.Ct. 1473, 1485 (2010)). Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is even more difficult, because both standards are "highly deferential," and because *Strickland's* general standard has a substantial range of reasonable applications. *Richter*, 131 S.Ct. at 788 (citations omitted). The issue under § 2254(d) is not whether counsel's actions were reasonable, but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

**A. Failure to Present Expert Testimony**

In Ground One, Petitioner contends that defense counsel, Bradley Roach, was ineffective for failing to retain an expert to challenge the first blood alcohol reading of .088 when the other evidence strongly suggested that Petitioner was below the presumption of intoxication. (Doc. 1 at 6)

Respondents concede that Petitioner properly exhausted this claim in state court. (Doc. 14 at 6) On post-conviction review, Petitioner argued that defense counsel was ineffective for failing to challenge the "blood alcohol reading barely above the legal presumption when in fact all of the other evidence strongly suggested the Defendant was below the presumption of intoxication," and for failing to present expert testimony regarding the "lack of impairment." (Respondents' Exh. D) The trial court rejected Petitioner's claims and the Arizona Court of Appeals affirmed finding that, "it appears trial counsel chose to challenge the state's evidence by, *inter alia*, establishing during his cross-examination of the state's expert that the officer's detection of only two out of six cues of intoxication under the horizontal gaze nystagmus test did not correlate with [Petitioner's] [B]AC of .088. That counsel did not present his own expert appears to have been neither deficient nor prejudicial." (Respondents' Exh. H) The Arizona Court of Appeals' decision was the last reasoned decision of the state court. (*Id.*) Thus, this Court will review the appellate court's decision to determine whether its rejection of Petitioner's claim of ineffective assistance of counsel was contrary to, or an objectively

unreasonable application of, *Strickland*, or whether it was based on an unreasonable determination of the facts. *Robinson*, 360 F.3d at 1055.

Petitioner argues that the initial BAC reading of .088, taken approximately 1.5 hours after the accident, was inconsistent with later readings that were much lower, indicating that the first reading was flawed or otherwise contaminated. (Doc. 1 at 3-4) He further argues that finding only two of six cues on the HGN test was inconsistent with the .088 BAC finding, further undermining the reliability of the first BAC test. (*Id.*) Thus, Petitioner argues, expert testimony was necessary to demonstrate these inconsistencies to the jury. In support of his first claim of ineffective assistance of counsel, Petitioner cites the affidavit of criminalist Chester Flaxmeyer which he presented on post-conviction review. (Doc. 1 at 4; Respondents Exh. I at 5-6) Petitioner contends that, had defense counsel retained a qualified expert, such as Flaxmeyer, he would have presented the following testimony:

> (A) HGN validation studies indicate that three or fewer cues are indicative of passing the HGN test;
>
> (B) depending on which of two HGN validation studies is relied upon, a finding of only two cues, such as is the case here, is consistent with [Petitioner]'s blood alcohol being below the presumption of intoxication level of .08 or even .05;
>
> (C) that based upon the standard elimination rates that are expected from such a low blood alcohol blood reading, the first blood alcohol reading of .088 is inconsistent with the two cues found on the HGN test; and
>
> (D) that second and third blood alcohol results .037 and .022 are consistent with each other and with the two cues found on the HGN test.

(Doc. 1 at 4)

Although Roach did not present a defense expert, he elicited testimony from the State's expert regarding these inconsistencies. Officer Havens, who conducted the HGN test, testified that he "observed two cues of nystagmus," and that "[f]our cues or more means there's about an 80 percent [chance] . . . that person is going to be over the .08 legal limit." (Respondent's Exh. M at 177). On cross-examination, the State's expert, Michael Sloneker, testified that he "would be surprised to see only two cues at an [sic] .08 [BAC] level" and that he "would expect to see four, most likely even six [cues]." (Respondents' Exh. O at 21)

Petitioner argues that his statement "turned a favorable HGN result on its head." (Doc. 1 at 5)  However, the record does not support this argument. During an interview with Petitioner's post-conviction counsel, defense counsel Roach stated that Sloneker's testimony "was exactly what he was looking for" and that the State's expert pointed out the discrepancy between the HGN results and the first blood test result.  (Respondents' Exh. K at 24)  Roach further explained why he did not retain an expert for the defense:

> My experience with juries and experts the defense calls . . .has been spotty at best . . . I've seen lots of cases, this was both as a prosecutor and a defense attorney, where the defense expert has hurt more than helped.  It either appeared liked, quote, unquote, a prostitute, an intellectual prostitute or . . . helped the State's case and so I bring in experts, but my general rule is if I can prove it by the State's experts, I don't.

(Respondents' Exh. K at 9)

To establish ineffective assistance of counsel under *Strickland*, a petitioner must show that counsel's performance was objectively deficient and that counsel's deficient performance prejudiced the petitioner. *Id.* at 687; *Hart v. Gomez*, 174 F.3d 1067, 1069 (9th Cir. 1999).  To be deficient, counsel's performance must fall "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  When reviewing counsel's performance, the court engages a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment. *Id.*  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

Under *Strickland's* deferential standard, although Petitioner's counsel could have retained a defense expert to testify regarding the discrepancies between the first blood test and HGN results, his decision to follow a different strategy - eliciting testimony from the State's expert to show that the HGN evidence was inconsistent with the .088 BAC result - was not objectively deficient.  *Strickland*, 466 U.S. at 690.  In deciding not to call a defense expert, Roach relied upon his experience as a prosecutor and a defense attorney, and determined that the better approach was to elicit the testimony from the State's expert.  In determining whether

counsel's performance was deficient, tactical decisions of trial counsel deserve deference when counsel makes an informed decision based on strategic trial considerations and the decision appears reasonable under the circumstances. *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). Here, defense counsel's strategic decision not to call his own expert did not constitute ineffective assistance "simply because in retrospect [what might have been a better] tactic [is] known to have been available." *See Strickland*, 466 U.S. at 689; *see also United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981) ("[Petitioner's] allegations amount to nothing more than a difference of opinion with respect to trial tactics. That alone generally does not constitute a denial of effective assistance of counsel"). The ultimate decision not to call witnesses at trial is well within counsel's "full authority to manage the conduct of the trial." *Taylor v. Illinois*, 484 U.S. 400, 418 (1988) ("Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision . . . not to put certain witnesses on the stand. . . . "). The record reflects that counsel's decision not to call an expert witness was a reasonable strategic choice, and Petitioner has not shown that the state court's rejection of his claim of ineffective assistance based on the failure to offer expert testimony was contrary to, or an unreasonable application of, *Strickland*.

Having determined that counsel's performance was not deficient, and that the State court's determination on that prong was not an unreasonable application of *Strickland*, the Court need not consider *Strickland's* prejudice prong. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."); *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other."). However, the Court notes that even if counsel's performance was deficient for failing to present expert testimony emphasizing the inconsistencies between the .088 BAC and the HGN test, Petitioner has not carried his heavy burden of showing "that there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694 (emphasis added). As previously discussed, although defense counsel did not call his own expert to testify regarding the inconsistencies between the HGN test and the .088 BAC

result, he elicited such testimony from the State's expert. Additionally, whether Petitioner "was under the influence of intoxicating liquor," was a jury question. (Respondents' Exh. Q at 24) The court instructed the jury that:

> If there was at that time 0.08 percent or more concentration of alcohol in the defendant's blood, it may be presumed that the defendant was under the influence of intoxicating liquor.
>
> The law further provides that the foregoing provisions shall not be construed as limiting the introduction and consideration of any other competent evidence bearing upon the question of whether or not the defendant was under the influence of intoxicating liquor.
>
> You are instructed to look at all the facts in this case. These are rebuttable presumptions; the jury is free to accept or reject those presumptions as triers of fact.

(*Id.*) The evidence presented at trial included the .088 BAC, which allowed the jury to presume Petitioner was under the influence of intoxicating liquor. However, even without additional expert testimony that Petitioner argues counsel should have presented, the record contained evidence which the jury could have relied upon to reject that presumption. Specifically, as defense counsel emphasized, Petitioner exhibited only two cues on an HGN test which was administered by Officer Havens, who was HGN-certified and had a 93% accuracy rate administering the HGN test. (Respondents' Exh. M at 155, 176, 178-79, Exh. P at 24) Counsel also emphasized that, other than the faint odor of alcohol, Officers Havens did not notice signs of impairment in Petitioner. Specifically, Officer Havens testified that he noticed "no slurring of [Petitioner's] speech, no swaying, no difficulty walking, no staggering . . . no red, watery, bloodshot eyes." (*Id.* at 24) Officer Havens did not perform any other field sobriety tests on Petitioner. (*Id.* at 25)

In short, Petitioner has not shown that there is a "reasonable probability that, but for counsel's [failure to present expert testimony], the result of the proceeding would have been different." 466 U.S. at 694; *Hart*, 174 F.3d at 1069. The record included evidence indicating that the .088 BAC reading was inconsistent with finding only 2 cues on the HGN test. Expert testimony would have been cumulative of the evidence actually presented during trial. Thus, there is no reasonable probability the jury would have changed its verdict in light of expert

- 14 -

testimony. The jury was instructed that it could reject the presumption that a .08 more BAC meant Petitioner was under the influence of intoxicating liquor. As a general rule, it is presumed that jurors follow the trial court's instructions. *See Kansas v. Marsh*, 548 U.S. 163 (2006). The jury considered the evidence, and made a determination. Petitioner, understandably, is unhappy with the way the jury weighed the evidence. However, Petitioner has not shown there is a reasonable probability that the result of his trial would have been different had defense counsel presented expert testimony pointing out the inconsistencies between the .088 BAC and the results of the HGN test because those inconsistencies were already presented through other testimony. Finally, on the most serious charge - manslaughter - the jury convicted Petitioner of the lesser included offense of negligent homicide. And, the jury could not reach verdicts on four other counts. Thus, defense counsel's strategy was effective and Petitioner has not shown that the State court's rejection of his claim of ineffective assistance of counsel based on counsel's decision not to call an expert was contrary to, or an unreasonable application of, *Strickland*.

### B. Causation Instruction

In Ground Two, Petitioner contends that counsel was ineffective for failing to request a jury "instruction regarding causation when the evidence justified such an instruction and the failure to request such an instruction would have constituted a reversible error." (Doc. 1 at 6) Petitioner presented this claim on post-conviction review. (Respondents' Exh. D) The trial court rejected this claim and the appellate court affirmed. Because neither court specifically discussed the jury-instruction issue, this Court independently reviews the record to ascertain whether the state court decision was an objectively unreasonable application of *Strickland*. *Reynoso*, 462 F.3d at 1109.

In Ground Two, Petitioner argues that defense counsel was ineffective for failing to request a jury instruction on supervening cause based on Tatlock's testimony regarding the positioning of the motorcycles which supported Petitioner's contention that a motorcycle crossed into his lane "causing him to execute an accident avoidance maneuver." (Doc. 1 at 6)

At trial, Petitioner testified that he saw a headlight coming towards him in his lane and that he swerved to avoid the vehicle. (Respondents' Exh. O at 43) Petitioner argued that he did not drift off the road, but that he was attempting to avoid an accident. One of the State's witnesses, off-duty police officer Tatlock, testified that he observed the motorcycles on the road shortly before the accident. (Respondents' Exh. N at 170-71) Tatlock testified that Gaylord's orange motorcycle was in front of Husk's black one, contrary to Husks' testimony that he was always in front of Gaylord. (Respondents' Exh. N at 170-73) Based on this testimony, Petitioner infers that Husk must have passed Gaylord at some point, and that this was the headlight Petitioner saw coming toward him and that he attempted to avoid. (Doc. 1 at 9) Petitioner presented this theory at trial, and now states that "trial counsel's final argument was essentially premised on the [fact] that Husk's conduct caused Petitioner to make a hard right turn to avoid Husk, and in doing so was unable to regain control of the vehicle which crossed the highway and collided with Gaylord's motorcycle[,] causing his death." (*Id.* at 10)

Petitioner admits that defense counsel adequately presented this theory to the jury. (Respondents' Exh. P at 12-40) However, he argues that counsel was ineffective for not requesting a superseding cause instruction. As previously stated, Petitioner was charged with manslaughter but the jury convicted him of the lesser included offense of negligent homicide. The trial court instructed the jury that it could not find Petitioner guilty of negligent homicide unless it found that he caused Gaylord's death. Specifically, the court instructed the jury that:

> The crime of Negligent Homicide requires proof that the defendant, by criminally negligent conduct, caused the death of another person.
>
> "Criminal negligence" means that the defendant failed to recognize a substantial risk of causing the death of another person. The risk must be such that the failure to recognize it is a gross deviation from what a reasonable person would do in the situation.

(Respondent's Exh. Q at 18) Thus, the jury could not have found Petitioner guilty of negligent homicide unless it found that he had "failed to recognize a substantial risk" of causing Gaylord's death. Thus, had the jury believed Petitioner's testimony that he was attempting to avoid a collision, it is unlikely it would have found Petitioner guilty. Thus, even assuming trial counsel was ineffective for failing to request a jury instruction on superseding cause, Petitioner

- 16 -

has not established prejudice.  In other words, Petitioner has not shown that there is a reasonable probability that the outcome would have been different had counsel requested a superseding cause instruction.

The State's accident reconstructionist, Tim Moebus, testified that Petitioner's vehicle was "driven straight or drifted off the road.  It initially moved right while it's still on the road and then counter-steered to the left. . . ."  (Respondents' Exh. N at 40)  Moebus also testified that he saw no "pre-collision, going off the road braking" by Petitioner's vehicle.  (*Id.* at 46)  Additionally, Sergeant Havens testified that he could not "locate any evasive tire prints" at the scene to corroborate Petitioner's statement that "he had taken evasive action to possibly avoid a vehicle."  (Respondents' Exh. M at 202)  Rather, Havens testified that he saw evidence that Petitioner made "a very gradual exit" from the roadway, indicating he had drifted to the side of the road.  (*Id*. at 203)  Havens also testified that he saw "what appeared to be left-hand steering, so the vehicle had drifted off the right-hand side of the roadway, the driver had applied the brakes to the vehicle and left-hand steering . . . in an attempt to gain the roadway."  (*Id*.)

The jurors heard Moebus' and Havens' testimony, and were able to consider for themselves whether that testimony supported Petitioner's evasive-action defense. Defense counsel argued that Petitioner was taking evasive action to avoid an accident, which resulted in the jury rejecting the most serious charge and, instead, convicting Petitioner of negligent homicide and a hung jury on the three endangerment counts.  The State court's determination that counsel was not ineffective for failing  to request a superseding cause instruction was not contrary to, or an unreasonable application of, *Strickland*.

### C.  Pretrial Interview - Michael Sloneker/HGN Test

In Ground Three, Petitioner argues that counsel was ineffective because, during his pretrial interview with the State's criminalist, Michael Sloneker, he did not ask "any questions concerning the correlation between the HGN test and a blood alcohol reading and thereafter asking such a question at trial without knowing the answer and getting an answer supporting the .088 BAC test and impugning the validity of the HGN test."  (Doc. 1 at 7)  Petitioner presented this claim on post-conviction review.  (Respondents' Exh. D)  The trial court rejected

this claim and the appellate court affirmed. Because neither court specifically discussed this issue, this Court independently reviews the record to ascertain whether the State court decision was an objectively unreasonable application of *Strickland*. *Reynoso*, 462 F.3d at 1109.

Even assuming trial counsel's performance was deficient for failing to conduct a more thorough pretrial interview of Sloneker, Petitioner has not established prejudice. At trial, defense counsel asked the State's expert, "[W]hat would . . . two cues of the six that you're looking for in HGN, what, if any, effect or interpretation do you make of that as a criminalist?" (Respondent's Exh. O at 20-21) The State's expert answered that he "would be surprised to see only two cues at an (sic) .08 level," and that he "would expect to see four, most likely six." (*Id*. at 21) Petitioner argues that the expert's answer "hurt the Petitioner immeasurably." (Doc. 15 at 6) Petitioner contends that if counsel would have asked Sloneker that question during the pretrial interview, counsel would have been able to establish at trial that the first blood test, which returned a blood alcohol level over the legal limit, was flawed. (Doc. 15 at 10) Consequently, Petitioner argues, the jury would not have convicted him.

As Respondents argue, Sloneker's testimony supported the validity of the HGN teat and called the .088 BAC finding into question. Sloneker testified that the HGN test is the best field sobriety test available because "it's not dependent upon the individual['s] innate coordination, it's something they cannot control." (Respondents' Exh. O at 22) During closing argument, defense counsel referred to Sloneker's testimony when arguing that the HGN test was reliable. (Respondents' Exh. P. at 24-25)

Petitioner has not shown that counsel was ineffective for failing to conduct a more thorough pre-trial interview with Sloneker. During trial, counsel elicited testimony from Sloneker which indicated that the HGN test is the most reliable field sobriety test, and that a person with a BAC of .088 would be expected to exhibit more cues on the HGN test, and Petitioner only exhibited two cues. Thus, even without asking Sloneker about the correlation between two cues on the HGN test and a BAC reading of .088, counsel was able to elicit favorable testimony from Sloneker at trial. In view of the foregoing, Petitioner has not shown that the state court's rejection of this claim was an unreasonable application of *Strickland*.

**D. Pretrial Interview - William Tatlock**

In Ground Four, Petitioner argues that counsel was ineffective because, during his pretrial interview of Tatlock, he failed to ask a "basic question [about the] positioning of the motorcycles . . . and then learn[ed] for the first time at trial[] that [Tatlock's] observation of the positioning of the motorcycles totally contradicted the other State's witness [Husk] which precluded trial counsel from" cross-examining the State's key witness on that issue. (Doc. 1 at 7)    Tatlock's testimony regarding the positions of the motorcycles contradicted Husk's testimony that he was always in the lead, and gave some support to Petitioner's claim that he saw a headlight in his lane and swerved to avoid a collision.  Respondent argues that, contrary to Petitioner's assertion, Tatlock's contradictory statements were elicited during his pretrial interview.

Husk testified that he was riding his motorcycle "on the right side of the road where the passenger side of a car tire would be."  (Respondents' Exh. M at 14)  Gaylord, riding an orange motorcycle, was behind Husk "on the left side of the northbound lane were the driver side tire would be." (*Id*. at 14-15)  In other words, Husk testified that he was in front and to the right of Gaylord.  However, during his pretrial interview, Tatlock told defense counsel that the orange motorcycle [Gaylord] was "on the fog line [on the right side of the lane,]" and that the "outside vehicle" was a black motorcycle.  (Respondents' Exh. R at 4)  Thus, although Tatlock did not specifically state which motorcycle was in front, he described the positions of the motorcycles, which contradicted Husk's testimony.

Even if counsel was deficient for failing to specifically ask Tatlock during the pretrial interview which motorcycle was in front, Petitioner was not prejudiced thereby because Tatlock testified at trial to the positions of the motorcycles.   Tatlock testified that:

> The two motorcycles, an orange one was on the fog line and the black one was near the centerline and they [were] cantered from each other, the orange one being the furthest one in the front and the black one being the furthest one closest to me.

(Respondents' Exh. N at 170)   Petitioner argues that, because counsel did not discover this information during the pretrial interview, he was unable to cross-examine Husk - one of the first

witnesses at trial - with this information. (Doc. 1 at 12) After Tatlock testified, however, counsel could have recalled Husk to impeach him with Tatlock's testimony. Counsel explained that he chose not to do so, because "Husk [was] a very sympathetic witness." (Respondents' Exh. K at 35) Defense counsel explained that:

> I thought [Husk] came across as sympathetic . . . [S]o I had . . . two contradictory statements, both of which can't be true. I could have chosen to call him back and say isn't it true that it was the other way and he would have said no. Isn't it true that this guy said it was the other way and he would have said, no. I didn't see any utility in doing that.

(Respondents' Exh. K at 35) Thus, for strategic reasons, counsel chose not to impeach Husk with Tatlock's testimony. There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. A showing that counsel could have done more or better does not meet the burden of showing that the State court's decision was unreasonable. *See Valdez*, 770 P.2d at 319 (stating "[d]efendants are not guaranteed perfect counsel, only competent counsel"). Indeed, Petitioner admits that the "two examples of trial counsel's less than minimal competence [during the pretrial interviews], would not, in and of themselves, justify the granting of a Habeas petition." (Doc. 1 at 13) Additionally, Petitioner has failed to show that the cumulative effect of counsel's alleged deficient performance entitles him to habeas corpus relief. *See Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2004) (refusing to consider whether cumulative error violated defendant's constitutional rights because defendant did "not demonstrate[] prejudice as to the individual claims."). In summary, Petitioner has failed to show that the State court's rejection of this claim of ineffective assistance of counsel was an unreasonable application of *Strickland*. Accordingly, he is not entitled to habeas corpus relief.

## IV. Conclusion

For the reasons set forth above, Petitioner is not entitled to habeas corpus relief because he has not met his burden of establishing that the State courts unreasonably applied *Strickland*. Accordingly,

**IT IS RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus, doc. 1, be **DENIED**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **DENIED** because Petitioner has not made a substantial showing of the denial of a constitutional right.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment. The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See* 28 U.S.C. § 636(b)(1); Rules 72, 6, Federal Rules of Civil Procedure. Thereafter, the parties have fourteen days within which to file a response to the objections. Failure to file timely objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure to file timely objections to any factual determinations of the Magistrate Judge may be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See* Rule 72, Federal Rules of Civil Procedure.

DATED this 30th day of November, 2011.

Lawrence O. Anderson
United States Magistrate Judge